UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREGORY WEBSTER and LISA WEBSTER, | |
| Plaintiffs, | 19 Civ. 5638 (KPF) |
| -v.- | **OPINION AND ORDER** |
| CITY OF NEW YORK, | |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Gregory Webster and Lisa Webster bring this action against Defendant City of New York ("Defendant" or the "City"), seeking damages for injuries sustained when Gregory Webster tripped and fell while crossing a street in Manhattan. Plaintiffs allege that they have suffered severe personal injuries and loss of consortium as a result of the City's negligence in maintaining the crosswalk in which Gregory Webster fell.[1] The City now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth in the remainder of this Opinion, the Court grants Defendant's motion.

---

[1] Plaintiff Lisa Webster is Gregory Webster's wife, and her sole cause of action for loss of consortium is entirely derivative of her husband's claims. For ease of reference, the Court will refer to Gregory Webster as "Webster" or "Plaintiff" for the remainder of this Opinion.

# BACKGROUND[2]

## A.    Factual Background

### 1.    The Accident

On the evening of February 5, 2019, Gregory Webster left his office at 51 Madison Avenue and began walking toward Penn Station, accompanied by his colleague Mitchell Ascione.  (Def. 56.1 ¶ 1).  The two men approached the northeast corner of West 30th Street and Seventh Avenue, and Webster

---

[2]    The facts in this Opinion are drawn from Defendant's Local Rule 56.1 Statement in Support of Its Motion for Summary Judgment ("Def. 56.1" (Dkt. #39); Plaintiffs' Response to Defendant's Rule 56.1 Statement and Counterstatement of Undisputed Facts ("Pl. 56.1" (Dkt. #34-5)); and Defendant's Response to Plaintiffs' Rule 56.1 Counterstatement ("Def. 56.1 Reply" (Dkt. #36-1)).  The Court also draws facts from exhibits appended to the Declaration of Erik Zissu, Esq., in Support of Defendant's Motion for Summary Judgment ("Zissu Decl." (Dkt. #37); the Declaration of Christopher Fraser in Opposition to Defendant's Motion for Summary Judgment ("Fraser Decl." (Dkt. #34)); and the Supplemental Declaration of Erik Zissu, Esq., in Further Support of Defendant's Motion for Summary Judgment ("Zissu Reply Decl." (Dkt. #36-2)); including the Affidavit of Kim Salvo ("Salvo Aff." (Zissu Decl., Ex. H)), and exhibits attached thereto.  Further, certain facts are drawn from the transcript of the deposition of Gregory Webster ("Webster Dep." (*id.*, Ex. C)), the deposition of Mitchell Ascione ("Ascione Dep." (*id.*, Ex. D)), and the deposition of DOT Record Searcher Omar Codling ("Codling Dep." (*id.*, Ex. I)).  The Court also considers the Affidavit of Plaintiffs' Expert, Michael Kravitz ("Kravitz Aff." (Dkt. #34-7)), the Expert Report of Michael Kravitz ("Kravitz Expert Report" (Zissu Decl., Ex. T)), and certain exhibits attached thereto.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the non-movant, the Court finds such fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For convenience, Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment is referred to as "Def. Br." (Dkt. #38); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment is referred to as "Pl. Opp." (Dkt. #34-6); and Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment is referred to as "Def. Reply" (Dkt. #36).

proceeded to step into the crosswalk that traverses Seventh Avenue (the "crosswalk"), with Ascione walking behind him. (*Id.* at ¶ 2; Pl. 56.1 ¶ 2). Webster was more than halfway through the crosswalk when his left foot landed on the edge of a square depressed area, which area he later testified was approximately five to six inches deep. (Pl. 56.1 ¶ 3; *see also* Webster Dep. 21:1-12; Zissu Decl., Ex. B at 11:8-14, 12:6-20 (transcript of Gregory Webster May 6, 2019 Municipal Law § 50-h hearing testimony)).[3] Webster fell forward and onto the street, and his face hit the pavement. (Pl. 56.1 ¶ 3; Def. 56.1 ¶ 3). Ascione assisted Webster to his feet and helped him across the avenue. (Def. 56.1 ¶ 3). Webster's nose was bleeding "profusely" (Webster Dep. 22:16; *see also id.* at 22:11, 22:22-23; Ascione Dep. 18:8, 19:22-20:5), and Ascione retrieved napkins from a nearby bar to give to Webster to stanch the bleeding (Def. 56.1 ¶ 3, Ascione Dep. 18:24-19:1, 19:15-17). An ambulance was called, but before it arrived Webster and Ascione hailed a taxicab and directed the driver to NYU Langone Medical Center. (Def. 56.1 ¶ 3). At the hospital, Webster was examined and treated, with sutures placed on the bridge of his nose. (Webster Dep. 35:9-37:12). He was later diagnosed with a nasal fracture (*id.* at 37:13-16, 38:24-39:17), and continues to experience chronic pain and numbness in his face (*id.* at 39:22-40:6, 41:6-42:6; *see also* Ascione Dep. 30:15-20).

---

[3]     As discussed further below, the view of Plaintiffs' expert is that the depression that caused Webster's fall measured four inches deep at the time of the accident. (Kravitz Aff. ¶ 10).

During his deposition, Webster was shown photographs of the crosswalk taken within a few days of his accident.  The photographs depict a manhole cover in the crosswalk (the "manhole"), surrounded by a seemingly depressed square area.  (*See* Fraser Decl., Ex. 1 ("Webster Deposition Exhibits"); *see also* Webster Dep. 28:1-31:16, 32:15-33:17).  In two of the photographs, Webster circled an area within the depression as reflecting the approximate area where he had stepped immediately prior to his fall.  (Webster Deposition Exhibits at 1-2; Webster Dep. 29:10-16, 31:12-16).

### 2.    The Seventh Avenue Manhole

The manhole cover involved in Webster's accident is the property of the City of New York.  (Pl. 56.1 ¶ 24).  On May 3, 2017, employees of the New York City Department of Environmental Protection (the "DEP") conducted repairs to a water valve located at the manhole.  (Def. 56.1 ¶¶ 6-7; *see also* Zissu Decl., Ex. E (the "May 3, 2017 Water Valve Work Order")).[4]  The repairs involved excavating the water valve's "main line gate" — a twelve-inch valve used to open and close the water main.  (Pl. 56.1 ¶ 6; *see also* May 3, 2017 Water Valve Work Order).

---

[4]    Plaintiffs submit that in addition to the Water Valve Work Order, a "BWSO Field Operations Daily Work Sheet" and "Daily Excavation/Crew Report Checklist" should have been generated in connection with the May 3, 2017 repairs.  (Pl. 56.1 ¶¶ 27-28).  Defendant responds that no such documents were located in its search for hard copy records in the locations where such records are maintained in the ordinary course of business.  (Def. 56.1 Reply ¶¶ 27-28).  The Court understands that following the submission of its reply brief, Defendant located additional documents related to the crosswalk, including additional complaints and "gang sheets" post-dating Webster's accident.  (*See* Dkt. #40).  The Court was not informed as to whether this subsequent production included the May 2017 documents identified by Plaintiffs.

On December 7, 2018, at 6:49 p.m., Kim Salvo, a member of the public, called 311 to report a street defect at Seventh Avenue and West 30th Street. (Def. 56.1 ¶ 8; *see also* Zissu Decl., Ex. G (the "December 7, 2018 DOT Complaint No. 1"); Salvo Aff. ¶ 2). Salvo has since attested that she called 311 to report "deep depressions in the asphalt surrounding a manhole cover in the Crosswalk." (Salvo Aff. ¶ 3; *see also* Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11). She has identified the manhole and abutting depressions that were the subject of her complaint in several photographs produced by Plaintiffs, which photographs appear to be the same as those shown to Webster in his deposition. (Salvo Aff. ¶ 3; *see also id.*, Ex. 1; Webster Deposition Exhibits). As a result of Salvo's call, a maintenance repair order and pothole defect number were generated on a New York City Department of Transportation ("DOT") "FITS" database. (Pl. 56.1 ¶ 9; Def. 56.1 ¶ 9). A second member of the public called 311 shortly thereafter, at 7:27 p.m., to report a defect at the same location as that identified by Salvo. (Def. 56.1 ¶ 13; *see also* Zissu Decl., Ex. J (the "December 7, 2018 DOT Complaint No. 2" and with December 7, 2018 DOT Complaint No. 1, the "December 7, 2018 Complaints")). The latter complaint resulted in the generation of a duplicate repair order. (Pl. 56.1 ¶ 13; *see also* Codling Dep. 80:2-81:7).

Later that evening, at 8:25 p.m., a maintenance division repair crew was dispatched from a DOT facility in Manhattan. (Def. 56.1 ¶ 14; *see also* Zissu Decl., Ex. K (December 7, 2018 Manhattan Street Maintenance Pothole Sheet (the "December 7, 2018 Gang Sheet"))). After first stopping at another location

5

to address a reported defect, the crew arrived at the crosswalk at 10:50 p.m. (*see* December 7, 2018 Gang Sheet 2), and proceeded to locate two "A" sized potholes (less than one foot in diameter), and two "B" sized potholes (one to three feet in diameter) (*id.*; *see also* Pl. 56.1 ¶ 14; Codling Dep. 44:17-45:12). The gang sheet maintained by the repair crew reflects that the crew departed the location at 11:10 p.m., and that the defect was marked "XCL" (December 7, 2018 Gang Sheet 2), meaning "the repair was made and the defect was fixed" (Codling Dep. 36:20-22). The crew proceeded to stop at three additional locations to address separately reported defects. (*See* December 7, 2018 Gang Sheet 2).[5] A comment on the gang sheet reads as follows: "malfunctioned temp. dropped to 125 degrees & would not reach temp. Load had to be dumped due to the cold asphalt. Heavy traffic on route." (*Id.*). The comment does not indicate at what time or where the malfunction occurred. (*See id.*).

On January 29, 2019, a DOT employee made an internal complaint about a pothole defect at the intersection of Seventh Avenue and West 30th Street, which complaint was recorded in the DOT FITS database. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20, *see also* Zissu Decl., Ex. L (the "January 29, 2019 DOT Complaint")). On the evening of January 31, 2019, a DOT maintenance division repair crew identified a "C" sized pothole (greater than three feet in diameter) at the intersection. (Pl. 56.1 ¶ 21; *see also* Codling Dep. 44:22-45:12). The pothole was thereafter repaired and designated "XCL," or closed.

---

[5]     The December 7, 2018 Gang Sheet reflects that the maintenance crew closed one additional defect, and did not identify defects at the two final stops on their route. (December 7, 2018 Gang Sheet 2).

(Def. 56.1 ¶¶ 21-23; Pl. 56.1 ¶¶ 21-23; *see also* Zissu Decl., Ex. M (January 31, 2019 Manhattan Street Maintenance Pothole Sheet (the "January 31, 2019 Gang Sheet"))).

### 3.    **Plaintiffs' Expert Report**

In connection with Plaintiffs' opposition to the instant motion, their roadway expert, Michael Kravitz, PE, DFE, has submitted an affidavit and expert report regarding his review of the depression in the crosswalk where Plaintiff fell.  (*See generally* Kravitz Aff.; Kravitz Expert Report).  In his affidavit, Kravitz states that in his opinion, Defendant "failed to perform a permanent restoration of the roadway excavation on May 3, 2017 in violation of the New York City DOT Highway Rules."  (Kravitz Aff. ¶ 9).  Kravitz further attests that in his opinion, Defendant's December 7, 2018 repairs to the crosswalk were "improper," and "caused and created an immediately dangerous and defective condition in the form of a four-inch depression in the northern sidewalk at the intersection of 7th Avenue and West 30th Street, New York, New York."  (*Id.* at ¶ 10).

With respect to the May 3, 2017 excavation, Kravitz writes that the excavated area around the manhole was not "permanently restored," which allowed "storm water to penetrate the asphalt and cause failure to the subgrade as well as to deteriorate the asphalt due to freeze/thaw cycles in the winter months."  (Kravitz Expert Report 9).  The area thereafter "developed into a deep depression," to which DOT was alerted by members of the public on December 7, 2018.  (*Id.*).

While a DOT maintenance crew proceeded to repair the depression with asphalt within a few hours of receiving the complaints, Kravitz writes that the temperature that evening was too cold for such repairs.  (Kravitz Expert Report 10).  That is, the temperature was "below the 40 degree minimum temperature recommended for applying temporary fill greater than three (3) inches deep to the wearing course."  (*Id.*; *see also* Pl. 56.1 ¶ 29 (stating that per the "Record of Climatological Observations maintained by the National Centers for Environmental Information for Central Park, New York, NY," on December 7, 2018, the high temperature was 39 degrees Fahrenheit and the low temperature was 28 degrees Fahrenheit)).  Moreover, Kravitz observes that the December 7, 2018 Gang Sheet notes that the hotbox carrying the "temporary fill" asphalt "malfunctioned," and dropped to 125 degrees Fahrenheit, and that as a result the cold asphalt had to be "dumped."  (Kravitz Expert Report 10 (discussing December 7, 2018 Gang Sheet)).[6]  Kravitz concludes: "Based on the cold atmospheric temperatures, cold asphalt, and malfunctioning Hotbox, the temporary fill … could not adhere to the bottom and sides of the depression and therefore was not secured within the depression."  (*Id.*).  Thus, "the improper patch [began] to fail almost immediately."  (*Id.*).  The depression "was also impacted by vehicles braking and accelerating on the heavily trafficked roadway, loosening, dispersing and crumbling the improper patch and causing the deep defect around the manhole

---

[6]     As noted above, the December 7, 2018 Gang Sheet does not indicate at what point in the maintenance crew's route the malfunction occurred.  (*See* December 7, 2018 Gang Sheet 2).

cover." (*Id.*).  Of note, Kravitz's report does not discuss the repairs made to the crosswalk on January 31, 2019, although he indicates that he reviewed the January 31, 2019 Gang Sheet.  (*Id.* at 4).

To calculate the dimensions of the depression abutting the manhole that caused Plaintiff's accident, Kravitz conducted a photogrammetry analysis using a photograph of the manhole, which analysis is used to determine an unknown dimension in a photograph when the dimensions of other items in the photograph are known.  (Kravitz Expert Report 12, fig. 4).  Based on this analysis, Kravitz submits that the depth of the depression was approximately four inches at the time of Webster's fall on February 5, 2019.  (*Id.* at 12-13).

Excerpted below are Kravitz's calculations of the depression's fluctuations in measurements between the May 3, 2017 water valve excavation and Webster's February 5, 2019 accident.

| Calculation of Days Between Repair of Manhole on 7th Avenue and W. 30th Street | | | | | | | |
|---|---|---|---|---|---|---|---|
| Description | Repair Date | Days Between Repair | Average Settlement Rate - inch/day | | | | |
| Repair of MH Valve | 05/03/17 | | | | | | |
| Gang pothole closed | 12/07/18 | 583 | 0.01 | Inches/Day | | | |
| Gang pothole closed | 01/31/19 | 55 | 0.07 | Inches/Day | | | |
| | | | | | | | |
| Accident Date | 2/5/2019 | 5 | 0.80 | Inches/Day | 12 13/16 | 12/16th to 13/16 Inches per day | |
| | | | | | | | |
| Maximum Settlement - Inches | 4 | Inches | | | | | |

Figure 3.  The chart describes the number of days between the creation of the depression and the incident and gives the amount of average deterioration in inches per day that the defect developed.

(Kravitz Expert Report 11, fig. 3).  Working backward, Kravitz calculates that for the 583 days between the May 3, 2017 water valve excavation and the December 7, 2018 repairs, the depression abutting the manhole eroded at an average of .01 inches each day, for a total of 5.83 inches.  (*Id.*).  For the 55 days

9

following the December 7, 2018 repairs, Kravitz submits that the erosion rate increased to an average of .07 inches per day, for a total of 3.85 inches.  (*Id.*).  Although Kravitz's report does not otherwise discuss the January 31, 2019 repairs, his calculations appear to assume that the depression was again repaired in response to the January 29, 2019 DOT internal complaint, and that the rate of erosion thereafter accelerated dramatically to 0.80 inches per day during the five days between January 31, 2019, and Webster's accident on February 5, 2019.  (*Id.*).

Defendant urges the Court to disregard the Kravitz Expert Report as conclusory and speculative.  (Def. Reply 3-5).  And the Court agrees that there are a number of reasons to be skeptical of Plaintiffs' expert's conclusions.  *First*, while the Court will accept the Report's determination that the relevant depression's depth was four inches at the time of Webster's accident, it finds no basis for the Report's conclusion that the depression was approximately 3.85 and 5.83 inches deep immediately prior to the repairs in December 2018, and January 2019, respectively.  (*See* Kravitz Expert Report 11, fig. 3).  *Second*, Kravitz's analysis bakes in the assumption that following each repair, the patch degraded at a constant, yet wide-ranging rate.  (*See id.*).  Once again, the Court finds no support for this assumption in the Report.  Kravitz does not explain, for example, why the patch degraded at a rate of .07 inches per day following the December 2018 repairs, only to then erode at the exponentially more aggressive (albeit convenient) rate of .80 inches per day for the five days between the January 31, 2019 repairs and Webster's accident on February 5,

10

2019.  The Court finds this self-serving reverse-engineering to be less than persuasive.  *Third*, and relatedly, the Court sees some imprecision in the Report's account of the January 31, 2019 repairs.  The repairs are not mentioned in the Kravitz Affidavit, nor are they specifically discussed in the Kravitz Expert Report.[7]  However, the January 31, 2019 repairs are included in Kravitz's calculation of the depression fluctuations (*see id.*), suggesting that he assumed that (i) the repairs related to the same defect that caused Webster's accident, and (ii) those repairs were somehow faulty such that the rate of erosion increased rapidly in the following days.  The Court would have found this analysis more helpful had Kravitz addressed more directly his assumptions and conclusions about the January 31, 2019 repairs.

In sum, while the Court does not dispute Plaintiffs' expert's qualifications, it does find that his conclusions are at times conclusory, inconsistent, and/or unsupported.  The Court will not entirely disregard the Kravitz Affidavit and Expert Report, despite Defendant's urging (*see* Def. Reply 3-4), but as discussed *infra*, its skepticism of Kravitz's conclusions impacts its consideration of the parties' arguments.

## B.    Procedural Background

Plaintiffs commenced this action with the filing of their Complaint on June 17, 2019.  (Dkt. #1).  Defendant filed its Answer on August 16, 2019 (Dkt.

---

[7]    The Kravitz Expert Report only makes note of the following comment on the January 31, 2019 Gang Sheet: "Extreme cold conditions.  Cold patch 2.00 tons." (Kravitz Expert Report 4 (quoting January 31, 2019 Gang Sheet 2)).  But the Report does *not* make the argument that the conditions on January 31, 2019 were such that any pothole repairs would have immediately failed.  (*See generally id.*).

#10), and the Court thereafter endorsed the parties' proposed case management plan and permitted the parties to proceed to discovery (Dkt. #13). Following several extensions of the discovery deadline (*see* Dkt. #15, 17, 19, 21, 23, 25, 27, 29), on November 2, 2020, Defendant submitted a pre-motion letter seeking leave to move for summary judgment (Dkt. #30). Plaintiffs responded the next day, indicating their opposition to Defendant's motion (Dkt. #31), and on November 4, 2020, the Court issued a memorandum endorsement scheduling briefing on Defendant's motion for summary judgment (Dkt. #32). Pursuant to that schedule, Defendant's opening papers were filed on December 4, 2020 (Dkt. #33);[8] Plaintiffs' opposing papers and request for oral argument were filed on January 4, 2021 (Dkt. #34, 35);[9] and Defendant's reply papers were filed on January 18, 2021 (Dkt. #36).

On January 20, 2021, Defendant wrote to inform the Court that while it had represented in its reply briefing that it had produced to Plaintiffs "all responsive records" related to a DOT search for documents associated with the relevant crosswalk, it had subsequently determined that "[a] number of street work permits" and additional complaints and gang sheets post-dating Webster's accident had not been produced either due to error or because they were deemed not responsive. (Dkt. #40). Upon this discovery, Defendant produced the newly-identified documents to Plaintiffs, as well as a second DOT

---

[8]    Due to a filing deficiency, Defendant's opening papers were re-filed on January 20, 2021. (Dkt. #37-39).

[9]    Although the Court appreciated Plaintiffs' willingness to appear for oral argument, it determined that oral argument was not necessary to resolve the instant motion.

search report related to the crosswalk.  (*Id.* at 2).  On January 27, 2021, Plaintiffs wrote to request, in light of Defendant's supplemental production, that the Court grant them an adverse inference charge "that the late production contains evidence further bolstering prior written notice of the subject defect and the continued existence of the defect after the City's alleged repair on December 7, 2018." (Dkt. #41).  Defendant submitted a further reply on January 28, 2021, indicating it was available for a conference to discuss the issues raised by the parties' recent correspondence.  (Dkt. #42).  After considering Plaintiffs' request, on January 29, 2021, the Court ordered Plaintiffs to instead submit a letter either supplementing the arguments made in their opposition to Defendant's motion for summary judgment, or setting forth arguments in favor of reopening discovery.  (Dkt. #43).

In response to the Court's January 29, 2021 Order, on February 12, 2021, Plaintiffs filed a letter stating that they would continue to rely upon their previously submitted opposing papers, but seeking to compel Defendant's production of certain recently-produced documents in unredacted form.  (Dkt. #44).  At the Court's direction (*see* Dkt. #45), Defendant responded on February 19, 2021, informing the Court that the redacted information related to complaints received following Webster's accident, which information was neither responsive to Plaintiffs' discovery requests nor relevant to the instant motion (Dkt. #46).  Upon the Court's request, Defendant submitted unredacted versions of the requested documents for the Court's *in camera* review.  (*See* Dkt. #47).  The Court proceeded to consider both the documents and the

13

arguments presented by the parties, and determined that the unredacted

information was in fact not responsive and did not implicate any relevant

evidence.  (Dkt. #48).  The Court therefore denied Plaintiffs' motion to compel.

(*Id.*).  Accordingly, Defendant's motion for summary judgment is fully briefed

and ripe for review.

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions for Summary Judgment Under Rule 56 of the Federal Rules of Civil Procedure

A "court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v.

*Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).[10]  A genuine dispute exists where "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

*Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12

(2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is

"material" if it "might affect the outcome of the suit under the governing law[.]"

*Anderson*, 477 U.S. at 248.

---

[10]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Parks Real Est. Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir.

15

1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v.

*United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593

F.3d 159, 166 (2d Cir. 2010).[11]

### 2.   New York City Notice Requirements[12]

The New York City Administrative Code "unequivocally requires that

plaintiffs who sue the City for personal injuries allegedly caused by defects or

hazardous conditions in municipal streets and sidewalks plead and prove that

the City received prior written notice of those defects or conditions." *Rothstein*

---

[11]   At the outset, the Court addresses Plaintiffs' argument that Defendant has not met its burden on summary judgment because it has opted not to present an expert report to refute the findings of the Kravitz Expert Report. (*See* Pl. Opp. 6-7). In particular, Plaintiffs argue that "[t]he City's lack of a roadway expert to rebut the opinions of Plaintiffs' roadway expert, as well as the City's failure to depose Mr. Kravitz with respect to the opinions in his expert report, prevent the City from establishing its *prima facie* entitlement to judgment as a matter of law." (*Id.* at 7). Plaintiffs do not refer the Court to any cases in which the absence of a conflicting expert report is, itself, a sufficient basis for the denial of a summary judgment motion, and the Court is aware of cases indicating otherwise. *See, e.g.*, *Gowin* v. *Avox Sys., Inc.*, 40 N.Y.S.3d 822, 823 (4th Dep't 2016) (finding that on summary judgment, "plaintiffs were under no obligation to rebut the conclusion of defendant's expert with an expert of their own, inasmuch as 'expert testimony is not required where, as here, the question of whether there is an unsafe condition is within the common knowledge and experience of jurors'" (alterations omitted) (quoting *Infante* v. *Jerome Car Wash*, 859 N.Y.S.2d 644, 645 (1st Dep't 2008))). Moreover, for the reasons discussed throughout this Opinion, the Court finds that the Kravitz Expert Report does not establish any genuine disputes of material fact that militate in favor of denying Defendant's motion for summary judgment.

[12]   The Court's jurisdiction over this action arises from its diversity jurisdiction under 28 U.S.C. § 1332. (Dkt. #1 at ¶ 3). "Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state, here New York, to decide which state's substantive law governs." *Rothstein* v. *City of New York*, No. 09 Civ. 5888 (LTS) (HBP), 2011 WL 3296205, at *5 n.8 (S.D.N.Y. June 15, 2011) (quoting *Rocchigiani* v. *World Boxing Council, Inc.*, 131 F. Supp. 2d 527, 530 n.5 (S.D.N.Y. 2001)), *report and recommendation adopted*, 2011 WL 3273473 (S.D.N.Y. July 29, 2011). However, both "parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." *MIG, Inc.* v. *Paul, Weiss, Rifkind, Wharton & Garrison, LLP*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010) (quoting *Motorola Credit Corp.* v. *Uzan,* 388 F.3d 39, 61 (2d Cir. 2004) (internal citations and modifications omitted)), *aff'd*, 410 F. App'x 408 (2d Cir. 2011) (summary order); *see also Mortg. Resol. Servicing, LLC* v. *JPMorgan Chase Bank, N.A.*, No. 15 Civ. 293 (LTS) (JCF), 2017 WL 2889501, at *2 (S.D.N.Y. July 6, 2017); *Amtrust N. Am., Inc.* v. *Safebuilt Ins. Servs., Inc.*, 186 F. Supp. 3d 278, 281-82 (S.D.N.Y. 2016).

v. *City of New York*, No. 09 Civ. 5888 (LTS) (HBP), 2011 WL 3296205, at *5

(S.D.N.Y. June 15, 2011) (quoting *Mendelsohn* v. *City of New York*, No. 01 Civ.

5932 (GEL), 2003 WL 22510392, at *2 (S.D.N.Y. Nov. 5, 2003)), *report and*

*recommendation adopted*, 2011 WL 3273473 (S.D.N.Y. July 29, 2011).  Under

New York City Administrative Code Section 7-201(c)(2), also known as the

"Pothole Law":

> No civil action shall be maintained against the city for damage to property or injury to person or death sustained in consequence of any street, highway, bridge, wharf, culvert, sidewalk or crosswalk, or any part or portion of any of the foregoing including any encumbrances thereon or attachments thereto, being out of repair, unsafe, dangerous or obstructed, unless [i] it appears that written notice of the defective, unsafe, dangerous or obstructed condition, was actually given to the commissioner of transportation or any person or department authorized by the commissioner to receive such notice, or [ii] where there was previous injury to person or property as a result of the existence of the defective, unsafe, dangerous or obstructed condition, and written notice thereof was given to a city agency, or [iii] there was written acknowledgement from the city of the defective, unsafe, dangerous or obstructed condition, and there was a failure or neglect within fifteen days after the receipt of such notice to repair or remove the defect, danger or obstruction complained of, or the place otherwise made reasonably safe.

N.Y.C. Admin. Code § 7-201(c)(2); *see also Duguay* v. *City of New York*, 861 F.

Supp. 2d 236, 246 (S.D.N.Y. 2012).  Plaintiffs bear the burden of pleading and

proving that one of these three exceptions applies.  *See Duguay*, 861 F. Supp.

at 246; *see also Katz* v. *City of New York*, 87 N.Y.2d 241, 243 (1995) ("[P]rior

written notice of a defect is a condition precedent which plaintiff is required to

plead and prove to maintain an action against the City.").

"[A]s a matter of law, neither constructive notice nor written notice of defects near the accident site suffices to fulfill the notice requirement." *Rothstein*, 2011 WL 3296205, at *6 (quoting *Mendelsohn*, 2003 WL 22510392, at *3) (collecting cases).  With respect to the "written acknowledgement" exception, "a written statement showing that the city agency responsible for repairing a condition had first-hand knowledge both of the existence and the dangerous nature of the condition is an 'acknowledgement' sufficient to satisfy the Pothole Law." *Bruni* v. *City of New York*, 2 N.Y.3d 319, 325 (2004).

"If a municipal defendant establishes that it lacked prior written notice, 'the burden shifts to the plaintiff to demonstrate the applicability of one of two recognized exceptions to the rule — that the municipality affirmatively created the defect through an act of negligence or that a special use resulted in a special benefit to the locality.'" *Zinz* v. *Empire City Subway Co.*, No. 13 Civ. 4415 (LGS), 2014 WL 5293603, at *5 (S.D.N.Y. Oct. 14, 2014) (quoting *Yarborough* v. *City of New York*, 10 N.Y.3d 726, 728 (2008)); *accord Oboler* v. *City of New York*, 8 N.Y.3d 888, 889 (2007).  Moreover, the "affirmative negligence exception" is "limited to work by the City that *immediately* results in the existence of a dangerous condition."  *Oboler*, 8 N.Y.3d at 889-90 (emphasis in *Oboler*) (quoting *Bielecki* v. *City of New York*, 788 N.Y.S.2d 67, 68 (1st Dep't 2005)); *accord Rothstein*, 2011 WL 3296205, at *7.

**B.    Analysis**

**1.    Prior Written Notice**

Defendant submits that Plaintiffs have failed both to plead and to prove

that it had prior written notice of the defect that is alleged to have caused

Webster's fall.  (Def. Br. 6-12).  As discussed below, the Court agrees with

Defendant on both counts.

**a.    Plaintiffs Failed to Plead Prior Written Notice**

Defendant first argues that Plaintiffs failed to plead that it had prior

written notice of the depression abutting the manhole.  (Def. Br. 9-10).  And in

fact, Plaintiffs' Complaint alleges merely that

> [u]pon information and belief and at all times
> hereinafter mentioned, Defendant possessed *actual and
> constructive notice* of the dangerous defect and
> depression in the asphalt surrounding the manhole
> cover embedded within the Pedestrian Crosswalk.

(Dkt. #1 at ¶ 18 (emphasis added)).  Defendant submits that by confining their

allegations to actual and constructive notice, Plaintiffs have not met their

burden of pleading prior written notice of a defect.  (Def. Br. 9).  In response,

Plaintiffs observe that Defendant has not previously challenged the sufficiency

of their pleading, and argue that Defendant should be prevented from doing so

for the first time on its motion for summary judgment.  (Pl. Opp. 9-10).  In the

alternative, Plaintiffs request leave to amend their Complaint to properly allege

that Defendant possessed prior written notice.  (*Id.* at 10).

The Court agrees with Defendant that Plaintiffs' Complaint merely alleges

"actual and constructive notice," and thus fails to allege prior written notice.

19

*See Chirco* v. *City of Long Beach*, 966 N.Y.S.2d 450, 452 (2d Dep't 2013) ("Where, as here, a municipality has enacted a prior written notice statute, constructive notice of a condition is insufficient to satisfy the requirement of prior written notice, nor does actual notice obviate the need to comply with the prior written notice requirement[.]" (citations, alterations, and quotation marks omitted)).  But in the interest of the efficient use of both judicial and party resources, the Court would have preferred that Defendant raised this pleading deficiency at an earlier stage of the litigation.  *Cf. Shahzad* v. *Cnty. of Nassau*, No. 13 Civ. 2268 (JMA) (SIL), 2016 WL 11540145, at *18 (E.D.N.Y. Mar. 31, 2016) (refusing to "entertain a pleading challenge" where "discovery [was] complete and defendants have moved for summary judgment," and advising that defendants "should have pursued a [motion to dismiss] at the outset of the litigation").  Further, as Plaintiffs note, New York courts have found that the City is not prejudiced by amendments alleging prior written notice where the original complaint alleged actual notice.  (Pl. Opp. 10 (citing *Cruzado* v. *City of New York*, 915 N.Y.S.2d 548, 549 (1st Dep't 2011))).  However, under the circumstances, the Court finds that repleading would be futile, as "plaintiff[s'] failure is not merely one of pleading but of proof." *Mendelsohn*, 2003 WL 22510392, at *2.  For the reasons discussed below, there are no disputes of material fact as to whether the City received prior written notice of the alleged defective condition.  Accordingly, Plaintiffs' request for leave to amend is denied.

### b.   Defendant Lacked Prior Written Notice

The Court next addresses Defendant's argument that — compounding the Complaint's pleading deficiencies — Plaintiffs have also failed to raise a genuine dispute of material fact that Defendant had prior written notice of the defect alleged to have caused Webster's accident.  Defendant argues that none of (i) the May 3, 2017 Water Valve Work Order; (ii) the December 7, 2018 Complaints; or (iii) the DOT repair orders and December 7, 2018 Gang Sheet generated by the City in response to the complaints, sufficed to put it on notice of the alleged defect.  (Def. Br. 10-13).  Plaintiffs respond that Defendant has not established that it lacked prior written notice, given the existence of the December 7, 2018 Complaints, repair orders, and gang sheet.  (Pl. Opp. 8-9).  In the alternative, Plaintiffs argue that even if those documents did not constitute prior written notice, they nevertheless serve to demonstrate "written acknowledgement from the city of the defective, unsafe or obstructed condition."  (*Id.* at 9 (quoting *Berrios* v. *City of New York*, 979 N.Y.S.2d 799, 799-800 (1st Dep't 2014))).  For the reasons that follow, the Court agrees that Defendant lacked prior written notice, and that Defendant did not provide written acknowledgement of the defect for the purposes of Section 7-201(c)(2).[13]

---

[13]     In its opening brief, Defendant argues that neither the May 2017 Water Valve Work Order nor the January 29, 2019 DOT internal complaint constituted prior written notice.  (Def. Br. 10, 12-13).  Plaintiffs do not respond to these arguments, and instead contend that the December 7, 2018 Complaints and Gang Sheet sufficed to put Defendant on notice.  (Pl. Opp. 8-9).  The Court will thus consider Defendant's arguments concerning the May 2017 and January 2019 documents to be conceded. *See AT & T Corp.* v. *Synierse Techs., Inc.*, No. 12 Civ. 1812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (finding that plaintiff's "silence concedes the point" where it failed to discuss opponent's argument in its opposition to a motion for summary

The Court focuses on the December 7, 2018 Complaints and Gang Sheet — as do Plaintiffs in their briefing — and finds that they do not suffice as prior written notice. Plaintiffs contend that Salvo "unquestionably complained to the City on December 7, 2018 about the precise defect that caused [Webster's] fall" and, further, that "a second complaint about the same defect was also made" the same day. (Pl. Opp. 8). They also note that work orders were generated in response to the complaints, and that the December 7, 2018 Gang Sheet confirms the existence of two "B" sized potholes at the location

---

judgment); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (considering argument not addressed in opposition to motion to dismiss conceded).

Notwithstanding, the Court agrees with Defendant that the May 2017 Water Valve Work Order did not constitute prior written notice, as the work order predates Webster's accident by nearly twenty-one months and does not identify or otherwise discuss the depression that is alleged to have caused his fall. (*See* Def. Br. 10). *See Dalton* v. *City of Saratoga Springs*, 784 N.Y.S.2d 702, 705 (3rd Dep't 2004) ("In our view, the work order relied upon by plaintiffs is too remote in both time and space to satisfy the written notice requirement as it fails to identify the particular defect that caused [plaintiff] to fall and the location of that defect."). With respect to the January 29, 2019 Complaint, there is similarly no indication that the complaint concerned the same defect that caused Webster's fall. *See Haulsey* v. *City of New York*, 999 N.Y.S.2d 400, 401 (1st Dep't 2014) (rejecting FITS reports as insufficient where it was unclear whether any of the repaired potholes included the pothole that caused plaintiff's fall); *cf. Rothstein*, 2011 WL 3296205, at *11 ("[N]otice of a different defect in the same area as the defect in question does not satisfy the prior written notice requirement."). While the Kravitz Expert Report appears to assume that the January 31, 2019 repairs made in response to the January 29, 2019 complaint addressed that same defect (*see* Kravitz Expert Report 11, fig. 3), as discussed above, Kravitz provides no basis for that assumption. And even assuming *arguendo* that the January 29, 2019 Complaint did concern the same defect, it was received seven days prior to Webster's accident, and thus fell within the statutory "15-day grace period allowed to the City to repair or resolve the defect." *See Tortorici* v. *City of New York*, 16 N.Y.S.3d 572, 574 (2d Dep't 2015) (collecting cases); *see also* N.Y.C. Admin. Code § 7-201(c)(2). In any event, the January 29, 2019 complaint was resolved two days later, when a DOT maintenance division repair crew identified, repaired, and designated "XCL" a C-sized pothole. (Def. 56.1 ¶¶ 21-23; Pl. 56.1 ¶¶ 21-23; *see also* January 31, 2019 Gang Sheet). Further, there is no evidence in the record that Defendant received any complaints, written or otherwise, regarding the subject defect between January 31, 2019, and the date of Plaintiff's accident. *See Lopez* v. *Gonzalez*, 845 N.Y.S.2d 91, 93 (2d Dep't 2007) (affirming dismissal of complaint where "the plaintiff failed to present any evidence that the City received prior written notice of the subject defect following the [defect's] repair").

where Webster fell in February 2019.  (*Id.* at 8-9 (citing December 7, 2018 Gang Sheet; December 7, 2018 Complaints)).  Defendant counters that — as evidenced by the aforementioned documents — it dispatched a maintenance crew to repair the defect, which "extinguished or cured whatever notice may have existed as of December 7, 2018."  (Def. Br. 11).

*First*, the Court observes that New York courts have found that "citizen complaints" and "written repair orders" do not constitute prior written notice.  *See Lopez* v. *Gonzalez*, 845 N.Y.S.2d 91, 93 (2d Dep't 2007) (collecting cases).  In particular, courts have emphasized that 311 calls, such as those made by Salvo and another member of the public on December 7, 2018, even where reduced to writing, are "insufficient to satisfy the statutory requirement" of prior written notice.  *Haulsey* v. *City of New York,* 999 N.Y.S.2d 400, 401 (1st Dep't 2014) (citing *Gorman* v. *Town of Huntington,* 12 N.Y.3d 275, 280 (2009)).  In so finding, courts have reasoned that "[v]erbal complaints transcribed to a … work order do not satisfy the statutory requirement."  *See Dalton* v. *City of Saratoga Springs*, 784 N.Y.S.2d 702, 705 (3d Dep't 2004) (citing *Cenname* v. *Town of Smithtown*, 755 N.Y.S.2d 651, 651 (2d Dep't 2003)); *see also Rothstein,* 2011 WL 3296205, at *11 ("DEP complaints cannot constitute prior written notice because courts have held that citizen telephone complaints do not satisfy this requirement.  There is no support for plaintiffs' contention that multiple complaints alter this rule." (internal citations omitted)).

*Second*, even were the December 7, 2018 documents sufficient to provide prior written notice, Defendant proceeded to repair the condition to which it

was alerted, and Plaintiffs have not demonstrated that Defendant received further written notice of this defect following those repairs. *See Lopez*, 845 N.Y.S.2d at 93 ("[E]ven if the City had been provided with written notice of those prior defects, the plaintiff failed to present any evidence that the City received prior written notice of the subject defect following the repair[.]"); *accord Rothstein*, 2011 WL 3296205, at *12. Elsewhere in their briefing, Plaintiffs rely primarily on the Kravitz Expert Report to argue that the December 7, 2018 repairs created an immediately dangerous condition. (*See* Pl. Opp. 10-15). The Court will address these arguments in further detail when it turns to the affirmative negligence exception to the notice requirement, but in short, it is not persuaded that Plaintiffs' issues with the City's repairs dictate either a finding of notice or even a triable issue of fact. At base, Plaintiffs' argument that the defect recurred following the City's repairs does not obviate Section 7-201's notice requirement, and there is no evidence in the record to suggest that Defendant received written notice about this specific defect at any time between the December 7, 2018 repairs and the time of Plaintiff's accident. *See Capobianco* v. *Mari*, 708 N.Y.S.2d 428, 428 (2d Dep't 2000) (finding that the mere "allegation of a subsequent recurrence of a condition does not abrogate the need for prior written notice"); *accord McCarthy* v. *City of White Plains*, 863 N.Y.S.2d 500, 502 (2d Dep't 2008).

Plaintiffs argue that the Court should nonetheless find the existence of a genuine dispute as to notice, comparing the instant case to the record considered by the Second Department in *Pisiak* v. *City of New York*, 127

24

N.Y.S.3d 553 (2d Dep't 2020).  (Pl. Opp. 9).  However, in *Pisiak*, the Second
Department considered multiple DEP records indicating that (i) repairs were
made to the defect, but that a "hot patch" was still needed at the conclusion of
those repairs; (ii) there was a subsequent "cave-in" at the location, "with no
indication that a repair was undertaken thereafter"; and (iii) while a work order
had been submitted for the repair, "[t]here [was] no record that the hot patch of
the area was ever done[.]"  127 N.Y.S.3d at 555.  Here, the DOT records reflect
that — despite the notation regarding a malfunctioning hotbox — repairs were
made and marked "XCL," or closed.  (*See* December 7, 2018 Gang Sheet 2).[14]
In contrast to *Pisiak*, the records here do not reflect the City's awareness of a
need for any further repairs to the subject defect.  The Court thus remains of
the view that there are no material disputes of fact as to the issue of
Defendant's prior written notice.

 *Lastly*, the Court addresses Plaintiffs' contention that in the alternative,
Defendant provided "written acknowledgement" of the defect.  (*See* Pl. Opp. 9).
For many of the same reasons just discussed, this argument fails as well.  As
noted earlier, written acknowledgement requires "a written statement showing
that the city agency responsible for repairing a condition had first-hand

---

[14] Moreover, on the record before the Court, it is unclear at what time the hotbox
malfunctioned, and whether the malfunction occurred prior to, during, or following the
December 7, 2018 repairs to the crosswalk.  The December 7, 2018 Gang Sheet
indicates that a DOT maintenance crew was dispatched to a number of locations
between 9:50 p.m. and 1:25 a.m., and that the relevant crosswalk was the second of
five locations visited that evening.  (December 7, 2018 Gang Sheet 2).  The Gang Sheet
further reflects that at three of those five locations, defects were addressed and
resolved.  (*Id.*).  But the Gang Sheet does not identify the time at which the hotbox
malfunction occurred.  (*See id.*).

knowledge both of the existence and the dangerous nature of the condition[.]"
*Bruni*, 2 N.Y.3d at 325.  None of the DOT records available to the Court on this
motion "indicates first-hand knowledge of the dangerous nature of an observed
condition."  *Duguay*, 861 F. Supp. 2d at 247; *see also Dalton*, 784 N.Y.S.2d at
705 n.2 (determining that a DEP work order "lack[ed] the specificity to meet the
definition of an acknowledgment").  In other cases, courts have found such
knowledge where, for example, DEP employees attempted to erect a barricade
"or take other action from which an acknowledgment of the dangerous nature
of the observed condition can be inferred."  *Id.* (discussing *Bruni*, 2 N.Y.3d at
322).  Here, the records indicate that on December 7, 2018, complaints were
made, repairs were performed, and the issue was closed and resolved, with no
further action required.  *Cf. Bruni*, 2 N.Y.3d at 325 (finding that the "City was
aware both that there was a hole in the street and that it was dangerous"
where a DEP work order called for the replacement of asphalt and a City
employee set up a sawhorse and traffic cones around the hole).  Plaintiffs' other
proffered caselaw is similarly unavailing, as it either involves unaddressed
corrective action requests, *Berrios*, 979 N.Y.S.2d at 799-800, or
acknowledgements that a pothole existed in the vicinity of the plaintiff's
accident, *Llanos* v. *Stark*, 57 N.Y.S.3d 502, 504 (2d Dep't 2017).  In contrast,
the December 7, 2018 Gang Sheet reflects that any identified potholes in the
vicinity of Webster's fall were addressed and repaired, with no indication that
any danger remained upon the conclusion of the repairs.

In sum, the Court finds that Defendant has made a *prima facie* case of establishing that it neither had prior written notice of the defect, nor affirmatively acknowledged the defect's condition.  The Court next addresses Plaintiffs' arguments that there are genuine disputes of fact as to the affirmative negligence exception to the prior written notice requirement.

### 2. Plaintiffs Have Not Established Defendant's Affirmative Negligence

As Defendant has demonstrated that it lacked prior written notice, the burden shifts to Plaintiffs to prove either that (i) Defendant "affirmatively created the defect through an act of negligence," or (ii) "a special use resulted in a special benefit to [Defendant]." *Zinz*, 2014 WL 5293603, at *5 (quoting *Yarborough*, 10 N.Y.3d at 728).[15]  Both parties appear to agree that the "special use" exception does not apply to the instant matter.  (Def. Br. 14 n.5; *see generally* Pl. Opp.).  However, the parties disagree as to the applicability of the affirmative negligence exception.  Plaintiffs argue that there are material disputes regarding whether Defendant created the defect that caused Webster's fall, referring the Court to the Kravitz Expert Report's discussion of the May 2017 water valve excavation and the December 7, 2018 pothole repairs.  (Pl. Opp. 10-15).  Defendant rejoins that Plaintiffs have not demonstrated that this work resulted in any immediately apparent dangerous condition.  (Def. Br. 16-

---

[15]   While Plaintiffs submit that the Court need not consider the sufficiency of their opposition papers "in light of the City's failure to carry its burden of proof" (Pl. Opp. 8), given the Court's finding that Defendant has demonstrated a lack of prior written notice, it will consider whether Plaintiffs have established the applicability of any exception to the prior written notice requirement.  *See Zinz* v. *Empire City Subway Co.*, No. 13 Civ. 4415 (LGS), 2014 WL 5293603, at *5 (S.D.N.Y. Oct. 14, 2014).

22; Def. Reply 9-14).  The Court finds that Plaintiffs have not established any issues of fact as to whether Defendant engaged in an affirmative act of negligence.

"The affirmative negligence exception is limited to work by the City that *immediately* results in the existence of a dangerous condition." *Zinz*, 2014 WL 5293603, at *5 (quoting *Yarborough*) (emphasis added and alteration omitted); *accord Oboler*, 8 N.Y.3d at 889.  Although Plaintiffs' expert opines that Defendant "caused an immediately dangerous condition" with the December 7, 2018 repairs (Kravitz Expert Report 18, *see also id.* at 16), that conclusion is undermined by the analysis detailed in the Report itself.  The Kravitz Expert Report calculates that for the first 55 days, or approximately 8 weeks, following the December 7, 2018 repairs, the asphalt in the affected area eroded at an average settlement rate of .07 inches per day, for a total of 3.85 inches.  (*See id.* at fig. 3).[16]  As discussed above, the Court views Kravitz's erosion rate calculations with some skepticism, but even were the Court to accept this analysis on its face, it would nonetheless be required to reject the Report's

---

[16]    According to Kravitz's report, the rate of settlement accelerated dramatically to 0.80 inches per day during the five days between January 31, 2019, and the day of the accident, February 5, 2019, amounting to a total of 4.0 inches.  (Kravitz Expert Report 11, fig. 3).  As discussed above, Kravitz's report appears to assume that the January 31, 2019 repairs were made to the same pothole that caused Webster's injury, and further that such repairs were somehow faulty or improper.  But the record does not establish either that the January 31, 2019 repairs related to the condition at issue in the case, or that the repairs were inadequate.  And Plaintiffs do not argue otherwise — rather they submit that it was the December 7, 2018 repairs that caused the purportedly "immediately dangerous condition." (Pl. Opp. 12).  The Court has detailed its concerns with this unexplained ambiguity in Kravitz's analysis at some length (*see* Background Section A.3), and thus focuses above on other inconsistencies in the Report that are fatal to Plaintiffs' argument.

conclusion that the December 7, 2018 repairs resulted in an "immediately dangerous" condition.  (*See* Kravitz Expert Report 16 (concluding that the December 7, 2018 repairs caused "an immediately dangerous four-inch depression")).  Both New York courts and courts within this District have rejected similar arguments on the grounds that "such a timeline is too attenuated to ... constitute 'immediate results' for purposes of the affirmative negligence exception[.]"  *Zinz*, 2014 WL 5293603, at *5 (rejecting argument that "within a few weeks [of the repairs] most, if not all, of the fill disintegrated, resulting in the hole in which [plaintiff] fell" (alterations omitted)); *Wald* v. *City of New York,* 982 N.Y.S.2d 534, 536 (2d Dep't 2014) (determining that repairs made "more than 10 weeks prior to the ... accident, did not raise a triable issue of fact as to whether the City affirmatively created the condition, as there was no evidence that a dangerous condition existed immediately after the repair was completed or that the repair caused subsequent immediate deterioration"); *Spanos* v. *Town of Clarkstown,* 916 N.Y.S.2d 181, 183 (2d Dep't 2011) (holding that evidence that defendant undertook repairs two months before accident was "insufficient ... to raise an issue of fact as to whether the defendant's repair immediately resulted in the existence of a dangerous condition" (internal quotation marks and alteration omitted)); *Torres* v. *City of New York*, 834 N.Y.S.2d 164, 165 (1st Dep't 2007) (reversing prior holding that a defect that "develops over an extended period" suffices to establish affirmative negligence).

29

Moreover, the Kravitz Expert Report does not demonstrate that Defendant's repairs necessarily resulted in a more dangerous condition, but rather, appears to find that they were at most ineffectual, as "the temporary fill placed by the DOT Crew was not secured within the depression."  (Kravitz Expert Report 10).  The Report does not establish that the repairs "exacerbated" the defect, as it must do to demonstrate an affirmative act of negligence.  *See Arzeno* v. *City of New York*, 10 N.Y.S.3d 198, 199 (1st Dep't 2015) (holding that "an ineffectual pothole repair job which does not make the condition any worse [does not] amount to an affirmative act of negligence"); *see also Wilson* v. *Inc. Vill. of Hempstead*, 991 N.Y.S.2d 651, 653 (2d Dep't 2014) ("To fall within the [affirmative negligence] exception, the repair must immediately result in a dangerous condition which made the defective condition more dangerous than it was before any efforts were made to repair it." (internal citations omitted)); *Kushner* v. *Albany*, 811 N.Y.S.2d 796, 797 (3d Dep't 2006) ("[W]e find that an ineffectual pothole repair job which does not make the condition any worse is not an affirmative act of negligence."), *aff'd*, 7 N.Y.3d 726 (2006).

Finally, the Kravitz Expert Report finds that during the two months between the December 7, 2018 repairs and Webster's fall, the depression was further "impacted by vehicles braking and accelerating on the heavily trafficked roadway, loosening, dispersing and crumbling the improper patch and causing the deep defect around the manhole cover and casting[.]"  (Kravitz Expert Report 10).  This analysis further counsels against a finding — or even a

30

material dispute of fact — that Defendant's repair immediately resulted in the existence of a dangerous condition.  Rather, the Report establishes, at most, that any dangerous condition "developed over time with environmental wear and tear." *Yarborough,* 10 N.Y.3d at 728; *see also Torres*, 834 N.Y.S.2d at 165 (concluding that there was no evidence of affirmative negligence where plaintiff's expert determined that "the complained-of roadway depressions, although traceable to the City's negligence in repairing the roadway, did not appear immediately, but developed gradually as inadequately paved cobblestones became exposed, loose and displaced").

The Court is not persuaded by the cases upon which Plaintiffs endeavor to rely.  For example, in *Guss* v. *City of New York*, the DEP dug and partially repaired a large hole, and then submitted a work order for further repairs that were never completed.  46 N.Y.S.3d 652, 655-66 (2d Dep't 2017).  Moreover, at the time the partial repairs were conducted, the hole "was not flush with the rest of the street," which made it immediately evident that it posed a danger. *Id.* at 656.  Importantly, in finding affirmative negligence, the Second Department observed that the condition "did not result from the negligent repair of a pothole, resulting in the reappearance of the same pothole due to environmental wear and tear," but "[r]ather, the defect resulted from the affirmative act of creating a hole, and thereafter, failing to complete the restoration of the street." *Id.*  Similarly, in *Bania* v. *City of New York*, 70 N.Y.S.3d 183, 185 (2d Dep't 2018), the defendant conducted an improper repair of a sinkhole, which plaintiff's expert determined resulted "almost

immediately" "in the recurrence of the subject hole."[17]  Again, in marked

contrast to the instant case, the *Bania* court found no indication "that the

dangerous condition in question developed over time." *Id.*[18]

Lastly, Plaintiffs argue that Defendant's May 2017 excavation, and the

subsequent emergence of the depression surrounding the manhole cover,

violate various municipal regulations, and establish proof of Defendant's

negligence.  (Pl. Opp. 13-14 (referencing Kravitz Aff. ¶¶ 9, 12, 20-21)).

However, any such violations are not themselves sufficient to establish an

affirmative act of negligence for the purposes of Section 7-201(c)(2), which is

not predicated on a violation of municipal regulations, but on an act that

"*immediately* results in the existence of a dangerous condition." *Zinz*, 2014 WL

5293603, at *5 (emphasis added); *see also id.* ("Even assuming the City's

repairs were negligent, the notice exception does not apply because Plaintiff

---

[17]    Of note, the *Bania* plaintiff's expert characterized the repair of a sinkhole as "a bigger
undertaking" than what is accomplished by a pothole maintenance crew, as the latter
"[t]ypically … place[s] a superficial amount of patching asphalt" and "[does] not excavate
and use backfill[,]" while the former "requires excavation of an area that is typically
many time[s] greater than the area of underlying defect[.]"  (Zissu Reply Decl., Ex. W
(*Bania* Expert Witness Disclosure)).

[18]    Plaintiffs put forth additional cases that do little to bolster their argument for accepting
their expert's findings.  In *Maggio* v. *City of New York*, 759 N.Y.S.2d 395, 396 (2d Dep't
2003), while the court deemed the evidence submitted by plaintiff and his expert
sufficient to establish "that the subject pothole was created through an affirmative act
of negligence during the repaving of a roadway by the defendant only a few months
before the accident," the rather succinct decision does not provide any detail on the
contents of the testimony, or the court's consideration of it, such that this Court can
compare it to the record before it.  And while Plaintiffs refer to *Samuels* v. *City of New
York*, 795 N.Y.S.2d 814 (2d Dep't 2005), in support of their argument that the Court
should accept their expert's opinion that "the City created a condition that was
immediately dangerous to pedestrians" (Pl. Opp. 12), *Samuels* speaks to the need to
accept a non-speculative expert opinion, and not whether a court should accept an —
as here, unsupported and conclusory — opinion that a defendant's repairs created an
"immediately dangerous" condition.  *See* 795 N.Y.S.2d at 818.

has not adduced evidence that the repair immediately resulted in the existence of a dangerous condition."). In support of their theory of negligence, Plaintiffs refer the Court only to *Dowd* v. *City of New York*, 837 N.Y.S.2d 668 (2d Dep't 2007), but that decision is inapposite. The court in *Dowd* did not consider the applicability of the affirmative negligence exception, but merely observed that "proof that a defendant violated an applicable municipal regulation may be relied upon as some proof of negligence in support of a common-law negligence or Labor Law § 200 claim." *Id.* at 672. As neither of those claims is at issue in the instant matter, the Court does not find *Dowd* instructive. It will instead rely upon the more relevant decisions of New York courts and courts in this District, all of which confirm that the key inquiry is not whether a defendant's repairs were made in violation of a municipal regulation, but whether the repairs immediately resulted in the creation of a dangerous condition. As discussed above, Plaintiffs have not established that Defendant's conduct meets this requirement.

Accordingly, the Court finds no questions of material fact as to whether Defendant engaged in an affirmative act of negligence. With that, Plaintiffs have not prevailed on either theory of liability, and the Court must grant summary judgment in Defendant's favor.

## CONCLUSION

For the reasons stated in this Opinion, Defendant's motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     September 1, 2021
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

34